**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 29, 2019

**BY ELECTRONIC MAIL AND HAND DELIVERY – REQUEST FOR SEALING**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     **Re:**   *United States v. David Villanueva*, 16 Cr. 342 (SHS)

Dear Judge Stein:

     The Government respectfully submits this letter to advise the Court of pertinent facts concerning the assistance that David Villanueva has rendered in the investigation and prosecution of other targets of criminal activity involving extensive corruption in New York Police Department's Pistol License Division (the "License Division"). In light of these facts, and assuming that Villanueva continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Villanueva in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines. Villanueva is scheduled to be sentenced on June 12, 2019 at 4:00 p.m.

## The Underlying Criminal Conduct

     On June 16, 2016, Villanueva was charged by sealed indictment S2 16 Cr. 342 (SHS), which was unsealed upon his arrest on June 20, 2016.[1] He subsequently pled guilty on or about January 12, 2017 to superseding information S4 16 Cr. 342 (SHS), charging him with bribery offenses relating to bribe schemes he engaged in with Alex "Shaya" Lichtenstein, John Chambers, Frank Soohoo, and      as well as charging him with making a false statement. Specifically, the S4 Information charged Villanueva with one count of conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 (Count One), four counts of federal program bribery, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Counts Two through Five), and one count of making a false statement, in violation of 18 U.S.C. § 1001 (Count Six).

     For years, Villanueva—while a supervisor at the License Division—received bribes from Lichtenstein, Chambers, Soohoo, and      in exchange for granting clients of theirs favorable treatment in gun license matters. The favorable treatment Villanueva granted clients of Lichtenstein, Soohoo, and      typically consisted of the grant of gun licenses—usually

---

[1] The S2 Indictment also charged Alex "Shaya" Lichtenstein, who had previously been charged alone in the underlying indictment, 16 Cr. 342 (SHS).

licenses that allowed the clients the right to carry firearms concealed on their person anywhere in New York City at any time—swiftly and without a proper basis. The treatment Villanueva granted clients of Chambers occasionally consisted of upgrading clients to such licenses (again, swiftly and without proper basis), but more frequently consisted of helping Chambers's clients keep firearms licenses they already possessed when they were investigated by the License Division for incidents that might affect their continued fitness to hold the licenses.

    *A.  The John Chambers Bribery Scheme*

    Chambers, an attorney whose practice consisted exclusively of gun license matters, was the first to bribe Villanueva. Chambers and Villanueva formed a friendship once Villanueva became a supervisor in the License Division, and a number of Chambers's bribes to Villanueva took the form of gifts and social entertainment, but their nature as bribes quickly became apparent.

    Chambers and his wife first took Villanueva and Villanueva's then-wife out to dinner for Villanueva's birthday in 2006 and, at the dinner, surprised Villanueva with tickets for a Broadway musical immediately after—a musical which only Villanueva and his wife, not Chambers, would attend. Villanueva—who had been deeply in debt from wedding expenses several years before and would go on to declare personal bankruptcy in 2008—took the opportunity to have an evening's entertainment, even though by the second such occasion (for his wife's birthday) Villanueva realized that Chambers would be asking him to take official acts in return. Chambers continued to sponsor such evenings out—each time beginning with a dinner attended by Chambers, followed immediately by a Broadway show attended only by Villaneuva and his wife—on both Villanueva's birthday and his wife's birthday, every year until 2014.[2]

    Over time, Chambers provided more entertainment and other gifts to Villanueva. Chambers would also provide tickets for Villanueva and his family to attend the Radio City Music Hall Christmas Spectacular every year from 2006 to 2015—an event Chambers would not attend at all—and also occasionally provided tickets for Villanueva to attend other Broadway shows and baseball games on sporadic occasions (not holidays or birthdays). Chambers also, over time, provided Villanueva with gift cards, boxes of toys and baseball memorabilia for Villanueva's son, several articles of clothing, over $2000 in cash (principally for Nassau County-related license matters described below, as well as occasional smaller amounts of cash for Villanueva to spend on souvenirs at the outings Chambers sponsored), and two designer wristwatches, one of which had a list price of $8500.

    In exchange for these bribes, Villanueva gave Chambers's clients favorable treatment in gun license matters. The bulk of this favorable treatment concerned incident investigations— investigations conducted by the License Division into whether a licensee should retain their gun license in light of some incident (such as an arrest, a report of domestic dispute, an accidental discharge of the firearm, or a violation of the conditions of a license). He caused the closure of approximately 100 incident investigations faster than he otherwise would have for Chambers clients (allowing the clients to enjoy the return of their licenses, which were suspended during the investigations, faster), and of these he recommended that approximately half, or approximately 50,

---

[2] Villanueva divorced and remarried during this time period, and Chambers continued to sponsor such outings for Villanueva and his second wife as soon as he learned they were dating.

receive more favorable dispositions than he believed were warranted.[3]  For example, in 2013 one client of Chambers faced likely revocation of his full carry license after a series of police complaints regarding domestic disputes with his wife.  Although Villanueva knew that revocation was the appropriate disposition given the facts, Chambers offered him a designer wristwatch to recommend a different disposition.  As a result, Villanueva overruled the line investigator's recommendation of revocation, instead allowing Chambers' client to keep his full carry license (albeit by surrendering two other licenses he also held).  In exchange, Chambers gave Villanueva a designer wristwatch with list price of $8500.[4]

In addition to this conduct, Villanueva extended Chambers' clients other forms of favorable treatment.  He processed approximately 6 license renewals for Chambers clients faster than he otherwise would have, and he upgraded approximately 5 or 6 licenses to carry status (the least restrictive form of license) without proper cause.  He also issued Chambers' clients numerous purchase orders (authorizations to purchase firearms), which were supposed to be limited to one order every 90 days, without adhering to this 90-day rule.[5]

At Chambers' request, Villaneuva would on occasion revoke the licenses of clients who would not pay Chambers.  On two occasions, Villanueva sent these letters to the clients, but on the other approximately five occasions Chambers—after receiving a draft of the letter from Villanueva—told Villanueva not to send the letter because the client had subsequently paid Chambers.

In addition to the actions he took regarding matters pending before the NYPD's License Division, Villanueva also used his influence as an NYPD sergeant to seek favors from counterparts at the Nassau County Police Department license section.[6]  Villanueva asked professional contacts of his at the Nassau County license section to renew the licenses of three clients of Chambers who were each encountering difficulties in renewing their licenses, and in exchange received the $2000 in cash from Chambers described above.  Of this $2000, $500 was provided in person and $1500

---

[3] As incident sergeant, Villanueva did not have the final decisionmaking authority over the disposition of an incident investigation, but he had the authority to make a recommendation which typically carried substantial weight and could overrule the recommendation of the line-level investigator who carried out the investigation.

[4]

[5] Villanueva issued purchase orders in this way for multiple individuals who were not bribing him, as it was a relatively common practice in the License Division despite being contrary to policy.

[6] It was not uncommon for NYPD officers involved in gun licensing to seek favors from their Nassau County counterparts, or vice versa, particularly given the geographical proximity between the two jurisdictions, so Villanueva had a measure of de facto influence arising from his ability to grant or withhold favors requested by Nassau County officers.

was mailed to Villanueva hidden in magazines ($500 per mailing on three occasions, each consisting of a $100 bill being taped to one of five pages of a magazine being mailed).

###### B.  The Alex "Shaya" Lichtenstein Bribery Scheme

Like Chambers, Alex "Shaya" Lichtenstein bribed Villanueva in exchange for assistance with License Division matters.  Lichtenstein served for many years as a high-ranking supervisor in the Borough Park-based Shomrim, a volunteer neighborhood patrol, and through his connections to law enforcement, Lichtenstein created a business expediting gun license applications.  As a so-called expediter, Lichtenstein charged significant sums of money to assist individuals with filling out applications to the License Division and to advise them throughout the process of seeking a gun license. In connection with his expediting business, Lichtenstein engaged in a scheme to kick back some of his fees to New York City Police Department officers, including Villanueva, in order to ensure that the officials approved, or at the very least expedited, his clients' applications.

In all, from approximately 2012 to approximately 2015, Lichtenstein gave Villanueva approximately $20,000 in cash, the use of his credit card to purchase Broadway tickets, limousine rides on two different occasions, airline tickets for a trip to San Diego, a menorah for Villanueva's wife's grandmother, and $500 each for Villanueva's children to spend while taking a trip to Disney World.[7]

In exchange, Villanueva facilitated granting approximately 100 full carry licenses for clients of Lichtenstein, on a highly expedited basis and without proper justification.  Villanueva's role was to ensure that each license was approved, first by the initial reviewer (typically co-defendant Richard Ochetal), and then by himself.  Final approval was performed by the License Division's then-executive officer Michael Endall, who in practice deferred to Villanueva's approval of Lichtenstein clients.  In many instances, Villanueva and Ochetal (who similarly received bribes from Lichtenstein, including a cut of Villanueva's proceeds) did not conduct any substantive interview of Lichtenstein's clients, despite License Division protocol requiring interviews.  They performed only minimal diligence, often doing no more than running an individual's rap sheet and mental hygiene history.  Moreover, because of Lichtenstein's bribes, Villanueva and Ochetal conducted little to no investigation into whether applicants for Limited or Full Carry licenses had a legitimate business need for those licenses. After the licenses had been approved, Villanueva would also gather supporting documentation to add to the files in order to disguise the fact that the licenses had been approved without proper documentation.  Sometimes Villanueva would himself forge the "letter of necessity," i.e., the key piece of documentation justifying the issuance of the license, which was supposed to be provided by the license applicant. Because of the bribery scheme in which Villanueva participated, individuals received gun licenses even though they had misdemeanor convictions and, in at least one instance, a felony conviction; a history of domestic violence; and substantial driving violations.  Individuals with significant arrest histories were also approved.  For example, one successful applicant had prior out-of-state

---

[7] Villanueva's assistance, described below, contributed to Lichtenstein's reputation for speed and success and enabled Lichtenstein to charge exorbitant amounts for his otherwise rather modest services.  Specifically, Lichtenstein typically charged applicants between $10,000 and $16,000 per license, and occasionally as much as $18,000, a small portion of which he kicked back to Villanueva.

arrests for criminal possession of a loaded firearm, reckless endangerment, and use of a dangerous weapon. Another had a pending case for menacing with a firearm at the time his application was approved.

In several cases, Lichtenstein paid Villanueva to upgrade his clients' licenses, such as from a relatively restrictive business premises license to a less restrictive limited carry license, or from a limited carry to a maximally permissive full carry license. Villanueva upgraded these licenses without requiring any additional paperwork, contrary to License Division rules, and Lichtenstein paid him for the upgrades he approved. In this manner, an individual could ultimately receive a carry license without ever having submitted an application justifying his or her need for such a license, by initially applying for a premises license, after which Lichtenstein would pay Villanueva for an unjustified upgrade.

### C. The Frank Soohoo Bribery Scheme

Frank Soohoo was the proprietor of a police equipment store who was friends with Villanueva and other NYPD officers. After their friendship began, at Villanueva's suggestion, Soohoo began a gun license expediting business out of his store. From approximately 2014 to 2016, Soohoo approached Villanueva and other NYPD officers about gun license matters for clients of Soohoo, and provided Villanueva and other officers with expensive gifts, largely in the form of vacations, in exchange for license approvals for Soohoo's clients.

Soohoo paid in cash for several expensive vacations with Villanueva, Ochetal, and their wives (which Soohoo and his own wife would also attend). Soohoo paid for three vacations attended by Villanueva, Ochetal, Soohoo, and their respective wives (to the Bahamas, Mexico, and the Dominican Republic), and one attended just by Villanueva, Soohoo, and their respective wives (to Hawaii).

In addition to the vacations, Soohoo routinely provided expensive catered sushi lunches for Villanueva, Ochetal, Dean, and Espinel at Soohoo's police equipment store, and hosted Villanueva, Ochetal, Dean, and Espinel at the store for after-hours parties on three occasions. In addition to paying for the food and alcohol at these parties, Soohoo paid for prostitutes to attend the first two parties. Villanueva did not patronize the prostitutes, and told Soohoo to stop inviting prostitutes to the parties before the third one. Sohoo also gave Villanueva a total of approximately $1000 in cash.

Villanueva assisted clients of Soohoo in license-related matters, including approving licenses for unqualified applicants. In one complex scheme, Villanueva helped secure a firearm to an individual who was federally barred from possessing a firearm due to a felony conviction. In this scheme—which Dean planned but which Villanueva helped to execute—the License Division approved a license for the ineligible individual's brother, who then purchased a firearm and sold it to the ineligible individual (a sale to a sibling does not necessitate running a background check). Villanueva's role was to assist in approving a license for the ineligible individual's brother, which he did knowing of the plan to use the brother-to-brother transfer to circumvent Soohoo's client's ineligibility.

### D.

### E.  The Paul Dean and Robert Espinel Post-Retirement Bribery Scheme

In late 2015, two other NYPD officers in the License Division, Lieutenant Paul Dean and Robert Espinel, approached Villanueva and Ochetal with a new bribery scheme.  At the time, Lieutenant Paul Dean was executive officer, the second-in-command uniformed officer, at the License Division.  Dean and Espinel planned to retire from the NYPD and create their own gun license expediting business.  In order to ensure the success of their business, Espinel and Dean planned to bribe Villanueva and Ochetal to enable their clients to get special treatment from the NYPD.  Espinel and Dean held a meeting with Villanueva and Ochetal at which they pitched this plan in detail, expressing that it would be preferable for Villanueva and Ochetal to take bribes from Espinel and Dean, whom they could trust, rather than from other gun-license expediters.  At this meeting, Villanueva and Ochetal both signaled their assent to the plan, though they each harbored doubts about pursuing it.  At Espinel and Dean's behest, Villanueva joined them when they approached the competing gun-license expediter Lichtenstein to demand he cede his business to Dean and Espinel.

Around this time, however, increased scrutiny was cast upon the License Division when rumors arose that Lichtenstein was charging as much as $16,000 for a gun license.  Given the rumors regarding Lichtenstein, as well as what he perceived as the riskiness of the plan proposed by Dean and Espinel, Villanueva decided, in consultation with Ochetal as well as the Commanding Officer of the License Division, to stop working with Lichtenstein and Soohoo, and not to assist Dean and Espinel with their expediting business.  Lichtenstein was arrested within a few months, and Villanueva's conduct was exposed shortly thereafter.

### F.  Dealings with James Grant

Villanueva was first introduced to Lichtenstein by            then the License Division's commanding officer, along with another NYPD officer, then-Captain James Grant, at a meeting in            office.

Following this meeting, Villanueva handled gun license favors directly and indirectly requested by Grant, in addition to commencing the bribery scheme with Lichtenstein discussed above.  Lichtenstein eventually confided in Villanueva that Grant was among the police officers on Lichtenstein's payroll, a fact corroborated by bribe spreadsheets later seized from Lichtenstein's home, and that Grant sent gun-license expediting clients to Lichtenstein.

On at least one occasion, Grant arranged for an improper gift to be given to Villanueva in exchange for gun licenses. Specifically, Villanueva expedited gun license applications for two purported hoteliers (the "Hoteliers") after Grant introduced the Hoteliers to Villanueva at the License Division. In exchange for Villanueva's assistance with these gun licenses, Grant coordinated a free hotel stay for Villanueva in or around May 2015, which Villanueva accepted as an improper gift funded by the Hoteliers. After Villanueva accepted the hotel stay, Grant contacted Villanueva to tell him to upgrade the gun licenses issued to the Hoteliers, which he did.

At Grant's request, in or around 2014, Villanueva also assisted in expediting a gun license application for Jeremy Reichberg, a self-styled "community liaison" from Brooklyn who was separately bribing Grant and other police officers. Based on approvals from Villanueva, Ochetal, and Captain Endall, Reichberg was given a full carry gun license despite lacking proper paperwork and any legitimate justification for such a license. Villanueva helped issue this gun license as a favor to Grant both because Grant was a high-ranking NYPD official and because Villanueva understood that Grant was a close associate of Lichtenstein's, with whom Villanueva was by then engaged in a significant amount of bribery-induced business.[8]

*G. False Statements*

On April 17, 2016, the day of Lichtenstein's arrest, Villanueva was interviewed at his home by FBI agents. In this interview, Villanueva was asked whether he had received any gifts from Lichtenstein or Soohoo. Villanueva falsely told the agents he had not, seeking to protect himself as well as the other corrupt officers he had been working with. Villanueva also falsely claimed to have no knowledge of Grant ever bringing anyone to the License Division in an attempt to assist someone obtaining a permit.

### Villanueva's Cooperation

Villanueva—with an exemplary degree of candor and remorse—provided substantial assistance to a number of the Government's investigations and prosecutions related to widespread and disparate corrupt schemes involving the License Division. He provided critical testimony in two trials against three defendants -- Chambers, Grant, and Reichberg. His cooperation was a critical component to the charges against Dean and Espinel, and his readiness to provide testimony in that case assisted the Government in securing guilty pleas from both defendants. Additionally, Villanueva would have provided critical testimony against Lichtenstein had he not pled guilty.

**I.    Villanueva's Initial Cooperation and Assistance in the Charged Case**

Villanueva first proffered on October 5, 2016, several months after he, Lichtenstein and Ochetal had been indicted in the charged case but before Lichtenstein pled guilty. Over the course of four extensive proffers, Villanueva provided details of his corrupt conduct with Lichtenstein, Soohoo, Chambers, and _____ as well as concerning the corrupt conduct of Dean and Espinel. From the outset, Villanueva demonstrated a firm commitment to accepting responsibility for his misconduct and answering the Government's questions candidly. He did not begin by minimizing his role in the conduct or attempting to embellish the actions of any of the individuals

---

[8] Grant made efforts in 2015 to arrange the same treatment for Jona Rechnitz, a co-conspirator who was working with Reichberg to bribe Grant; however, Rechnitz never completed his pursuit of the gun license and it was ultimately not issued.

he implicated.  Instead, he was extremely forthcoming and candid, unhesitatingly so, concerning his criminal conduct and his knowledge of the conduct of others.

Although Villanueva did not formally enter into a cooperation agreement with the Government until after Lichtenstein had pled guilty, he began providing detailed, critical information about Lichtenstein prior to the plea.  Had Lichtenstein gone to trial—as it seemed likely he would when Villanueva began proffering with the Government—Villanueva would have been a critical witness given his close involvement in Lichtenstein's criminal conduct.  Ultimately, Lichtenstein was sentenced by the Court to 32 months' imprisonment in March 2017.

## II.   *United States* **v.** *John Chambers*, **17 Cr. 396 (WHP)**

Villanueva was instrumental in the investigation and prosecution of Chambers, who, as noted above, was a corrupt attorney and former prosecutor who paid bribes to obtain favorable treatment for numerous clients in gun license related matters.  Chambers would likely not have been able to have been charged without the information provided by Villanueva, and although by the time of trial the Government had developed substantial evidence besides Villanueva's testimony—largely derived from information provided by Villanueva—Villanueva was still the most important witness at trial.

Chambers's criminal conduct was exposed by Villanueva's cooperation.  Villanueva provided to the Government information about Chambers's bribes—and corroborating evidence from Villanueva's phone and email accounts—that the Government would have been unlikely to obtain by any other means.  In addition to enabling charges to be brought against Chambers at all, Villanueva was a critical witness at Chambers's trial.  Villanueva was the only cooperator who testified against Chambers, and the only live witness in a position to describe many significant aspects of Chambers' conduct.  Despite being cross-examined extensively, Villanueva was, in the Government's opinion, not discredited in any significant respect.  Apart from Villanueva, the most inculpatory evidence against Chambers was documentary, and Villanueva provided persuasive and compelling explanations of many of the documents as well as important pieces of the story not contained in the documents, such as the details of cash transfers or the content of key phone conversations.  A number of the documents involved License Division files and licensing-related jargon that could have been confusing to a jury without the benefit of Villanueva's explanation.  And more fundamentally, much of the evidence at trial was either provided by Villanueva (such as a number of physical gifts Chambers had given Villanueva over the years, which Villanueva kept and provided to the Government) or obtained as a result of Villanueva's cooperation (such as incriminating emails from Chambers' email account that derived from a search warrant obtained in part because of information provided by Villanueva).

Beyond the specifics of the evidence presented at trial, Villanueva's detailed explanations to the Government of the complex formal procedures and criminal schemes used at the License Division were invaluable in focusing and guiding the trial team's preparation and ensuring an effective presentation at trial.

In short, it is highly unlikely that Chambers—an attorney and former prosecutor engaged in an egregious years-long corruption scheme—could have been caught or held accountable if not for Villanueva's cooperation.  Ultimately, Chambers was sentenced by the Honorable William H. Pauley III to one year and one day in prison in November 2018.

### III.   <u>*United States* **v.** *Paul Dean, Robert Espinel, and Gaetano Valastro*</u>, 17 Cr. 398 (ER)

The case against Paul Dean, Robert Espinel, and Gaetano Valastro[9] was a direct result of Villanueva's cooperation, as well as the cooperation of Richard Ochetal.  Without the cooperation of both of these witnesses, the criminal conduct of these men may never have been uncovered and charged.  As discussed above, Paul Dean had been the second-in-command at the License Division, holding the rank of Lieutenant, and Robert Espinel was another fellow License Division colleague.  To date, Dean is the highest-ranking officer charged in connection with the federal investigation of misconduct at the License Division.  In significant part due to Villanueva's cooperation, Dean and Espinel were charged with accepting bribes and gratuities in exchange for favors during their time in the License Division, their post-retirement conspiracy with Valastro to become expediters themselves by bribing Villanueva and Ochetal, and extorting other expediters, including Lichtenstein, to cede business to them.  These charges relied substantially on information and corroborating records provided by Villanueva.  Had the case proceeded to trial, Villanueva's testimony would have been essential to the prosecution.

Ultimately, all three defendants pleaded guilty.  The strength of the evidence supplied by Villanueva – whose cooperation was known to the defendants – and the potential impact of his testimony were critical factors in securing their timely acceptances of responsibility.  Indeed, each of the defendants pleaded guilty following Villanueva's public testimony at the Chambers trial, discussed above, which was closely monitored by counsel for those defendants.  Without Villanueva's cooperation, it is unlikely that these convictions could have been obtained.

The Honorable Edgardo Ramos sentenced Dean to 18 months' imprisonment in January 2019, and Espinel to a year and a day of imprisonment in April 2019.

### IV.   <u>*United States* **v.** *James Grant, Michael Harrington, and Jeremy Reichberg*</u>, <u>16 Cr. 468 (GHW)</u>

Villanueva served as a critical witness at the trial of James Grant and Jeremy Reichberg, conducted before Judge Gregory H. Woods in November 2018 through January 2019.  He testified over the course of two days, and endured substantial cross-examination.  Although Villanueva had not personally received bribes from Reichberg, he was an important witness to a key official action former NYPD Deputy Inspector James Grant had delivered for Reichberg's benefit:  a full carry gun license.  Villanueva was able to compellingly testify that Grant had asked Villanueva to assist in obtaining a full carry gun license for Reichberg, that Villanueva had helped expedite the issuance of that license for Reichberg at Grant's personal behest, and how Grant's position, as a superior officer in the NYPD, mattered in influencing Villanueva's actions to approve Reichberg's gun license on a highly expedited basis.[10]

---

[9] Valastro was a former NYPD officer and proprietor of a store that sold firearms and firearms paraphernalia who participated in Dean and Espinel's scheme to retire and become corrupt expediters.

[10] For evidentiary reasons unrelated to Villanueva's credibility and the value of his information, Judge Woods did not permit Villanueva to testify about Grant's relationship to Lichtenstein, such as Grant's conversations with Villanueva regarding the acceptance of gifts from Lichtenstein and continuing to assist Lichtenstein at the License Division, or Grant's involvement in referring gun-

The trial concluded with a split verdict: conviction on nearly all counts for Reichberg, and acquittal for Grant.  Villanueva's testimony proved essential to securing Reichberg's conviction. Indeed, the only testimony requested by the jury in their deliberations was that of Villanueva, and of Ochetal, who also testified at the trial about Grant's exercise of influence over the approval of Reichberg's gun license.  The conviction of Jeremy Reichberg was itself of great significance. Reichberg had engaged in a far-reaching scheme to bribe some of the highest-ranking members of the NYPD, along with other public officials, for at least eight years.  In exchange for bribes, Reichberg demanded and often received a wide range of official actions, including the deployment of NYPD cars, boats, and helicopters to serve himself and his associates; influence over personnel transfers and promotions; favorable dispositions on arrests; police interference in ordinarily-civil disputes; and more.  While Grant was ultimately acquitted by the jury, the verdict did not appear to reflect any determination about Villanueva's credibility.  Villanueva's testimony was simply one piece of evidence in a complex, two-month-long trial, which required the jury to weigh numerous factors in assessing each defendant's guilt.  Villanueva fulfilled his responsibility to testify truthfully when called, irrespective of the outcome.  The Honorable Gregory H. Woods sentenced Reichberg  to 48 months' imprisonment in May 2019.

## Assessment of the Defendant's Cooperation

Villanueva was an exemplary cooperator.  He met with the Government literally dozens of times—almost all in person and typically for hours at a time—and he was thorough, helpful, and, above all, honest and forthcoming.  In his meetings with the Government, Villanueva also struck the undersigned as genuinely remorseful in a way that is difficult to communicate in writing.  He did not flinch at describing, or seek to displace responsibility for, the degree to which he betrayed the ideals of his profession or the disgrace his conduct had brought on the police department.

Villanueva's cooperation was not just extensive and candid.  It was extraordinarily effective.  Villanueva contributed significantly to prosecutions in two cases and convictions in four cases, including the convictions of the former Executive Officer of the Licensing Division and a second police officer.  He testified at two trials over the course of a combined four days, and proved a credible witness who withstood extensive cross-examination.  And, as much as his criminal conduct contributed to the systemic corruption of an important and sensitive government function – the awarding of gun licenses – his cooperation greatly assisted the Government and the NYPD in combatting that same corruption, both in prosecuting many others who participated it and in spurring what has become much-needed reform at the Licensing Division.   His substantial assistance thus merits significant credit.

## Analysis of Section 5K1.1 Factors

*1. "[S]ignificance and usefulness" of assistance (5K1.1.(a)(1))*

Villanueva's cooperation was extremely significant and useful.  As discussed above, Villanueva enabled the Government to bring charges against Chambers, Dean, and Espinel at all, was critical to the Government's successful prosecution of Chambers, Dean, Espinel, and Reichberg, and would have been highly significant as to Lichtenstein had he not pled guilty. Villanueva's cooperation further informed other investigations, whether or not they resulted in

---

license applicants through Lichtenstein.  Villanueva's provision of this additional information regarding Grant's misconduct nonetheless contributed to the value of his assistance.

charges or convictions, such as the investigation and prosecution of James Grant, a high-ranking official in the NYPD.

>    *2.   "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))*

The Government believes that Villanueva provided truthful, complete and reliable information, and that he did so from the beginning of his cooperation.  He answered questions honestly and provided voluminous supporting evidence, including from his electronic devices and physical gifts he received.  He did on occasion, during the course of his lengthy cooperation, make isolated inconsistent statements, but the Government believes these were all inadvertent mistakes or lapses in memory.  Indeed, some of these mistakes were actually helpful to the defense.  For example, when cross-examined by the defense about an occasion in which Chambers agreed to write a letter assisting his wife in disputing some consumer debt, Villanueva testified that Chambers had agreed to write this letter solely as a friend and not in exchange for any official action by Villanueva.  In fact, as the text messages showed and as he acknowledged on redirect examination, Villanueva explicitly had agreed to change the outcome of a Chambers client's case in exchange for Chambers writing this letter.  Villanueva was also candid about the limits of his knowledge and memory—he did not remember attending a baseball game with Chambers, and upon being shown a photograph of himself at a baseball game with Chambers, did not shape his testimony to the photograph but admitted that he still did not remember it.

>    *3.   "[N]ature and extent" of assistance (5K1.1(a)(3))*

Villanueva's cooperation was extensive and involved numerous lengthy debriefings, the review of voluminous License Division and email documentation (including the review of thousands of his own emails to assist in the identification of any discoverable information), the provision of a number of items of physical evidence, and substantial testimony at two different trials.  Villanueva also consented to a search of his cellphone that proved valuable in furthering the ongoing investigations.  Moreover, although Villanueva's cooperation against Lichtenstein did not end up being necessary because Lichtenstein pled guilty after Villanueva began to proffer, his willingness to provide significant testimony against Lichtenstein also demonstrates the extent of his cooperation.

>    *4.   "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))*

As Your Honor is aware, it is inherently risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved an extensive scheme and implicated defendants who were former senior law enforcement officers.  Moreover, although there were no specific threats to Villanueva or his family that the Government is aware of, the subject matter of Villanueva's testimony at the Chambers trial necessarily involved testimony about—and, in cross-examination, photographs of—Villanueva's minor children.  Moreover, both of the trials Villanueva testified at were closely covered by local news media, magnifying the reputational impact of Villanueva's testimony significantly.

>    *5.   "[T]imeliness" of assistance (5K1.1(a)(5))*

Villanueva was not the first defendant in the scheme to cooperate and did not begin to proffer until approximately four months after he was charged.  In the context of the larger investigation and series of cases, however, Villanueva's cooperation was sufficiently timely to

make him highly effective, as described herein.   While Villanueva formally entered into a cooperation agreement only after Lichtenstein pleaded guilty, Villanueva's anticipated cooperation against Lichtenstein helped secure Lichtenstein's guilty plea, and proved useful in preparing for Lichtenstein's sentencing.   Villanueva's cooperation against Chambers preceded— indeed, enabled—the entire prosecution of Chambers, and in significant part, Dean, Espinel, and Valastro.   Villanueva's cooperation also assisted the NYPD to identify additional gun-license holders who had benefited from these unlawful schemes, and to take action where appropriate to revoke, suspend, or review their eligibility for those licenses.   These actions were important to mitigating the potential safety risks caused by the conduct of Villanueva and his co-conspirators.

## Conclusion

In light of the foregoing, the Government respectfully submits that Villanueva's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a series of major bribery schemes.   *See* U.S. Sentencing Guidelines § 5K1.1(a)(1).   The Government also believes that the information provided by Villanueva was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2).   Accordingly, assuming that Villanueva continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Villanueva in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.   Due to the nature of this letter, the Government respectfully requests that the letter be filed and maintained under seal.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/ Paul M. Monteleoni
Paul M. Monteleoni
Kimberly S. Ravener
Alexander Rossmiller
Assistant United States Attorneys
(212) 637-2219/2358/2415

cc: Andrew Quinn, Esq. (by email)
    USPO Ross Kapitansky (by email)