```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

          v.                        16 CR 342 (SHS)

DAVID VILLANUEVA,
                                    Sentence
              Defendant.

------------------------------x

                                    New York, N.Y.
                                    June 12, 2019
                                    4:00 p.m.

Before:

        HON. SIDNEY H. STEIN

                                    District Judge




        APPEARANCES


GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
PAUL M. MONTELEONI
KIMBERLY RAVENER
ALEXANDER ROSSMILLER
     Assistant United States Attorneys


ANDREW C. QUINN
     Attorney for Defendant


Also Present:  MICHAEL BUSCEMI – FBI
               MARK KLAUSER – NYPD
```

1              (Case called)

2              THE COURT:  Good afternoon to all of you.  First, I

3     received by hand a letter in regard to this sentencing.  I

4     don't know if any of you have seen it.  I have the original

5     here.  It's from Christina Chambers.  Have the parties seen it?

6              MR. MONTELEONI:  The government has not, your Honor.

7              THE COURT:  I am going to hand it down so that you can

8     take a look at it.  In the letter she asks that essentially a

9     version of the same letter that was hand-delivered earlier,

10    yesterday, not be distributed because it contained information

11    about two minors.  I am going to honor that.  I'll file that

12    letter under seal.  The version she has simply strikes the

13    reference to two minors.  The names of the minors should not be

14    disclosed.  The parties should look at this letter and then we

15    will proceed.

16             MR. MONTELEONI:  Thank you, your Honor.

17             MR. BROWN:  Stephen Brown, Daily News.  May I request

18    that that version of the letter with the minors redacted be

19    posted on the docket, please?

20             THE COURT:  I'll listen to what the position of the

21    parties is after they read it.

22             MR. BROWN:  Thank you.

23             MR. MONTELEONI:  Your Honor, this is a somewhat

24    substantial letter.  In order to speed things up, does the

25    court object to my copying with my cell phone camera so I can

1   read it at the same time as defense counsel?

2           THE COURT:  No.  I'll have copies made now in the

3   courtroom.  And rather than my sitting here, we'll bring a copy

4   out for each of you to read it.  When you are ready, I'll come

5   up.

6           MR. MONTELEONI:  Thank you, your Honor.

7           (Recess)

8           THE COURT:  Did the parties hand the letter back?

9   Let's proceed.  The parties have now read it.

10          I have the following information.  I have the

11  pre-sentence report prepared on January 29 of this year and

12  revised on May 30th.  With that is the addendum and the

13  sentencing recommendation of the probation department, which is

14  for time served on all counts pursuant to 5K1.1.

15          I have the 5K letter itself dated May 29, 2019.  And I

16  have the sentencing memorandum of Mr. Villanueva, document 140,

17  which also has attachments of a variety of letters in support

18  of Mr. Villanueva.

19          Is there any additional information I should have, Mr.

20  Quinn?

21          MR. QUINN:  No, your Honor.

22          THE COURT:  Mr. Monteleoni?

23          MR. MONTELEONI:  In addition to the letter that we

24  have just discussed from Christina Chambers, we have just

25  handed to your deputy a forfeiture order that we have executed

1    today implementing the $75,000.

2              THE COURT:  Consent preliminary order of forfeiture?

3              MR. MONTELEONI:  That's correct.

4              THE COURT:  This is consented to, Mr. Quinn?

5              MR. QUINN:  Yes, your Honor.

6              THE COURT:  The defendant is consenting to the entry

7    of a money judgment in the amount of $75,000 constituting the

8    proceeds obtained by Mr. Villanueva from the offense.  I am

9    going to sign that now.  The consent preliminary order of

10   forfeiture has been signed by the Court.

11             Mr. Quinn, have you had a full opportunity to read and

12   discuss all this information with your client and have you in

13   fact read and discussed it with him?

14             MR. QUINN:  Yes, I have, Judge.

15             THE COURT:  Do you have any objections to the findings

16   of fact in the pre-sentence report?

17             MR. QUINN:  I do not, your Honor.  We had some earlier

18   exceptions.  We approached and addressed those with the

19   department of probation as well as with the U.S. Attorney's

20   office, and they were all resolved.

21             THE COURT:  Government, do you have any objections to

22   the findings of fact in the pre-sentence report?

23             MR. MONTELEONI:  No, your Honor.

24             THE COURT:  I hereby adopt the findings of fact in the

25   pre-sentence report.

1          Mr. Quinn, why don't you talk to me, sir.  What do you

2     want me to know?  I have read all this information, obviously.

3          MR. QUINN:  Judge, I thought that the pre-sentence

4     report was exhaustive and comprehensive, and I believe it

5     accurately portrayed both the crimes to which my client pleaded

6     guilty, his personal background and history, his professional

7     background and history, as well as the extraordinary lengths he

8     went to to make amends for his criminal acts.

9          I would also point the Court to the government's

10    submission, which goes into extraordinary detail.  As this

11    Court is very much aware, my client almost from the beginning

12    of this prosecution accepted responsibility and immediately did

13    everything in his power, in fact I don't think he could have

14    done anything more, to make amends for his acts.

15         He has provided substantial assistance to the

16    government.  He has testified publicly in two trials covered

17    extensively in the New York media.  He met with representatives

18    of the government on dozens of occasions for hundreds of hours.

19    He did everything he could to assist the government in rooting

20    out the corruption that was endemic to the pistol license

21    division, which admittedly he was a part of.

22         Judge, I would ask you to give great consideration to

23    all the efforts my client has made toward correcting his

24    mistakes and his assistance to the government and follow the

25    recommendation of the Department of Probation and impose a

J6CRVIL1

1      sentence of time served.

2            THE COURT:  Mr. Villanueva, do you want to say

3      anything to the Court?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Now is your opportunity.  Anything you say

6      can be used against you, sir, but I'm here to listen to

7      whatever you have to say.

8            THE DEFENDANT:  Sir, I stand in front of you

9      embarrassed.  I stand in front of you ashamed for the pain that

10     I have caused not only to my family but to the New York City

11     Police Department and the city as a whole.

12            Your Honor I grew up from humble beginnings.  I grew

13     up in East New York, where the crack epidemic had gone through

14     the roof.  I knew better.  I stayed away from people who were

15     doing drugs.  Fast money was never a consideration.  I even

16     decided to go to a high school which took an hour and 15

17     minutes to get to from my house so I would not be around the

18     people who were destroying my neighborhood.  During that time I

19     chose to become a cop.  My dreams came true.  I became a police

20     officer.  Eventually I went through the ranks and I made

21     sergeant.

22            Unfortunately for my focus and the demeanor that I had

23     to do right, I started associating myself with the wrong

24     people.  I brought great pain to everyone, especially to my

25     son.  I didn't tell him I was coming today, your Honor.  I will

never forget the pain, the embarrassment, and the confusion in

his eyes when his dad was brought out of his house in

handcuffs.  My son, who in two weeks graduates from high school

and was accepted to the college of his dreams, two weeks ago

his dad had to tell him he couldn't attend because my actions

created a void such that I can't help him financially.  So my

son cannot go to the college he wanted.  I failed as a dad.

        I have a stepdaughter who I don't consider my

stepdaughter, I consider her daughter.  She does competitive

swimming.  Your Honor, I have not been able to go to see any of

her meets because they are outside of New York state, out of

the jurisdiction that I can travel.  I failed as a dad again.

        To my wife who I married and a couple of months after

marriage I was arrested, she didn't deserve this.  She doesn't

deserve me.  But the whole time she stood by me.

        Your Honor, I am sorry for the pain I have caused.  I

have tried to amend for all the wrong I have done.  I have

allocated a ton of time to make things right.  I want to

continue making things right.  Your Honor, all I'm asking is

for a second chance and the opportunity to try to be a better

dad now that I have failed.

        Your Honor, the pain that I brought will probably

never go away.  I ask for forgiveness from my co-workers in the

NYPD, from my family.  The one person that will never forgive

me is myself, your Honor.  I will never be able to forgive

1    myself.

2           Your Honor, once again, what I did was wrong.  I take

3    full responsibility.  I blame no one.  I blame myself.  As I

4    told you earlier, I know wrong and right from the beginning of

5    life.  I allowed myself to get away from that in my

6    professional career.

7           Your Honor, once again I apologize, I apologize to my

8    wife, who is behind me; my children, who do not know I am here;

9    and to my fellow co-workers in the City of New York, your

10   Honor.  Please give me a second chance to make things right.

11          THE COURT:  Why did you do this?

12          THE DEFENDANT:  Your Honor, I was in an area where

13   corruption was fluent.  Instead of me putting my foot down and

14   actually reporting it, I allowed myself to become part of it.

15          THE COURT:  You became a corrupt cop.

16          THE DEFENDANT:  Correct.  I allowed myself to become a

17   corrupt cop.

18          THE COURT:  You dishonored the badge.

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  You dishonored the force.

21          THE DEFENDANT:  Correct, your Honor.

22          THE COURT:  To the extent there is corruption in the

23   police department, the public loses faith in law enforcement.

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  You were part of that.

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  Tell me again why you did this.  You said

3   you allowed yourself to become a corrupt cop.

4        THE DEFENDANT:  I allowed myself to become a corrupt

5   cop, your Honor.  Greed had part to do with it.  I was licensed

6   as a police officer.  Once I came back to sergeant, I was

7   brought into a circle where this was going on, and greed opened

8   my eyes.  I knew better from the time I was growing up in East

9   New York.  Instead of me saying no, your Honor, I have no

10  words, I allowed myself to become corrupt.

11       THE COURT:  Thank you.

12       Government, what would you like to say, if anything?

13       MR. MONTELEONI:  Thank you, your Honor.  The defendant

14  participated in a number of corrupt schemes.  He did so not

15  only as a law enforcement officer but as a supervisor.  The

16  type of corrupt schemes that he participated in impacted the

17  public safety of New York by allowing those who would not

18  qualify for the privilege of carrying firearms in New York to

19  gain that ability without a proper basis.

20       THE COURT:  What you mean is he allowed a felon to get

21  a weapon?  That's what you mean?

22       MR. MONTELEONI:  In one case, yes.  In many cases,

23  however, there were individuals who were not statutorily barred

24  by federal law from possessing weapons but still would not have

25  qualified under New York's rather restrictive gun license

1    regime.

2            THE COURT:  For things like full-carry licenses?

3            MR. MONTELEONI:  For full-carry licenses.  These were

4    individuals who were largely not barred from it but would not

5    have qualified for what he allowed, which was for them to walk

6    around the entirety of New York City with a concealed weapon

7    24-7.

8            THE COURT:  Full-carry like the hundred full-carry

9    licenses that were taken care of through Mr. Lichtenstein, if I

10   understand the testimony correctly?

11           MR. MONTELEONI:  Yes.  The majority of them were

12   through Lichtenstein.  There were some for some of the other

13   bribe payers.  There were also other individuals who had

14   licenses that they had acquired through other means but faced

15   loss of those licenses due to incidents that prompted

16   investigations into whether they were still fit to have a

17   license.  This was most directly Villanueva's responsibility as

18   the incident sergeant.  In exchange for bribes --

19           THE COURT:  In exchange for dinners, a watch, Broadway

20   tickets, limousines, lunches, parties, cash, right?

21           MR. MONTELEONI:  Yes, that's correct, your Honor, a

22   number of bribes of different forms.  He allowed individuals

23   who would otherwise have lost their licenses or had other

24   unfavorable dispositions short of absolute revocation to have

25   more favorable dispositions.  So yes, in some cases individuals

1   who should have had their licenses fully revoked were able to

2   continue to carry the weapons on their persons.

3           This is shocking conduct.  Its scope and extent, as

4   the Court pointed out, shakes public confidence in law

5   enforcement, which is absolutely corrosive to a society to have

6   corruption of this sort in the police department where we trust

7   and rely on law enforcement officers to protect all of us.

8           That said, Villanueva was an exemplary cooperator, as

9   we have said in our 5K letter.

10          THE COURT:  You said he showed exemplary candor, he

11  was highly effective, he was extraordinarily effective.  He

12  showed remorse according to you and certainly according to his

13  statement here.  He had dozens of meetings with them.  He gave

14  critical testimony.  This is a very favorable 5K letter.

15          MR. MONTELEONI:  That's correct, your Honor.  It is

16  lengthy and it is extensive both because of the sheer number of

17  cases that he participated in, cases that he allowed in some

18  cases to be brought at all.  Because he was so effective in

19  those cases, we thought it was only appropriate to do

20  everything that we could to bring that entirely to the Court's

21  attention.

22          As we say in the letter, the degree of remorse that we

23  believe he showed, it is not something you can really put into

24  words in a letter, but that is what we observed and we believe.

25          Something else that I think is a little hard to make

1   vivid is the degree of detail and specificity that he was able

2   to go into.  In addition to just telling us things that he

3   recalled, he went back and he searched old documents and old

4   items that he had lying around his house.  He went back and

5   brought us a wealth of information.

6          He was unflinching as to his conduct.  He also was

7   very focused and detail-oriented.  That is not to say that he

8   always got everything right, but just as his cooperation was

9   unusually extensive, we think that it was unusually focused and

10  precise.

11         There are cases that we just wouldn't have been able

12  to make, we think, without him.  We think it is very unlikely

13  that we would have been in a position to charge John Chambers,

14  who was an attorney and in fact a former prosecutor, for a

15  lengthy bribery scheme, which was the first bribery scheme that

16  Villanueva engaged in.

17         In sort of a factual portion of the answer to your

18  Honor's questions of how it started, that was chronologically

19  the first thing that happened.  Villanueva was offered this

20  free entertainment under social guises at a time when he was

21  experiencing significant financial stress.  That snowballed and

22  his conduct went far beyond, which was truly shocking.  That

23  case against Chambers certainly didn't rest on Villanueva's

24  word, but it absolutely had its genesis in information that he

25  provided that allowed us to develop powerful evidence

1    sufficient to bring that charge.

2           THE COURT:  I should say, although I have read the

3    Chambers letter, it is not materially affecting my decision

4    here.  Go ahead.

5           MR. MONTELEONI:  Yes, your Honor.  We certainly would

6    have some disputes with what's in it if it were going to affect

7    you, but we don't need to address that here.

8           Additionally, other corrupt law enforcement officers

9    in the license division, it is very unlikely that they would

10   have been able to be charged, including Lieutenant Paul Dean,

11   the highest ranking law enforcement officer who we have been

12   able to date charge in these matters.  That is also in great

13   part due to his cooperation as well as the cooperation of

14   others.

15          Villanueva's participation in a pattern of corruption

16   that has shaken the faith to a good extent of citizens of New

17   York in the police department is extremely noteworthy, but the

18   steps that he has taken to redress it and to allow us to remove

19   or mitigate it are also extremely unusual.  We certainly didn't

20   mean to convey that we do not consider his cooperation to have

21   been ordinary, run-of-the-mill, or perfunctory.

22          THE COURT:  You conveyed it clearly.  You are very

23   supportive of him.  By the same token, the guideline range is

24   57 to 71 months, substantial.  I certainly intend to give him

25   credit for his cooperation under 5K1.1.

14

1          The problem is, you're right, he has shaken the faith

2    of the populace in the police department, as everybody in this

3    group of cases has.  He was a policeman.  Policemen are and

4    ought to be, and I think he would agree with me, held to a

5    higher standard in terms their integrity and their honesty.

6          It is difficult for me to be able to give the

7    proverbial, as a defense lawyer would say, get-out-of-jail-free

8    card given the fact that he should be an exemplar of integrity

9    and honesty and fair dealing as opposed to, as I said before, a

10   corrupt policeman.

11         Yes, he is remorseful.  Yes, he has done what I think

12   are, I won't say fulsome, but certainly he really went all the

13   way in supporting you, and you're saying that that is true.

14   But it is hard to blink at the fact that he was actively

15   engaging in corruption while a police officer.

16         MR. MONTELEONI:  Yes, your Honor.

17         THE COURT:  I think some prison time is appropriate

18   given that.

19         MR. MONTELEONI:  That is a decision for the Court.  We

20   don't disagree with your assessment of either the severity of

21   the conduct or of his cooperation.  We do think that our

22   ability to investigate and to make these cases, our ability to

23   recognize cooperators who let us do that, is an important

24   consideration, which we know that the Court will consider.

25         THE COURT:  Of course you need cooperators to

1   prosecute wrongdoers.  There is no question about that.  They

2   have to be rewarded for that cooperation, and he will be.  But

3   as a general deterrence issue and as a sign that the courts

4   support the appropriate punishment for those who have committed

5   crimes, it seems to me that some prison time is appropriate.

6          MR. MONTELEONI:  I understand what the Court is

7   saying.  I would point the Court to page 9 of our 5K letter.

8          Let me pause on two housekeeping points.  First, as I

9   think my remarks were intended to convey, we do move under

10  section 5K1.1 of the guidelines for a downward departure in

11  light of his assistance to our investigations and prosecutions.

12  Second, we do intend to file a redacted version of this 5K

13  letter on the public docket following this sentencing,

14  submitted under seal.

15         As we point out in page 9 of our letter, Lieutenant

16  Paul Dean, who was entrusted with an even greater degree of

17  responsibility than Villanueva, was sentenced to 18 months of

18  imprisonment, and Robert Espinal to a year and a day of

19  imprisonment.  We understand that neither of them cooperated,

20  and we obviously believe that is an important factor for the

21  Court to consider in assessing proportionality and disparities.

22         THE COURT:  I agree.

23         MR. MONTELEONI:  Unless the Court has further

24  questions beyond that, we will rest on our submissions.

25         THE COURT:  Defense, you stood up before.  Did you

1    want to add something?

2         MR. QUINN:  I did, Judge.  In furtherance of the

3    government's comments in their 5K1 letter, your Honor, as the

4    government just pointed out, once my client was arrested and it

5    became clear to all of us on the defense team that he had done

6    acts for which he should be ashamed and has expressed shame

7    before the Court, he took it upon himself to do absolutely

8    everything he could to assist the government.

9         There is always the obvious hope that cooperation will

10   be rewarded and you may receive a lesser sentence.  I'm not

11   going to suggest there wasn't an element of that.  But I would

12   say the almost overwhelming motivating fact behind my client's

13   actions was to assist the government because he was ashamed of

14   what the pistol license department had turned into.  He was a

15   shamed that he was part of it, and he wanted to assist them in

16   making sure that nothing was left behind, that no clues, no

17   suspects were left there, no individuals who could continue to

18   engage in this type of corrupt practice would be left there.

19        What he did was he took it upon himself, and I think

20   the government just conceded as much, to almost conduct his own

21   investigation and do everything he could on as much evidence as

22   possible, bring as much evidence to the government as he could.

23   His motivation wasn't I want to walk away at the end of this

24   case.  It was let me help you correct the mistakes that I was a

25   part of.

 1           When the government says they have difficulty

 2   conveying or communicating his level of remorse, I think that

 3   is what is difficult to convey, that that was my client's

 4   sincere and genuine attempt for participating in this scheme

 5   and allowing it to occur under his watch and while he was

 6   there.  So he took a genuine effort to make sure he provided as

 7   much information to the government as he could, and it was

 8   successful, Judge.  Obviously, as the 5K1 letter shows, my

 9   client was successful.  He was believable and credible.

10           THE COURT:  He was extremely helpful to the

11   prosecution.

12           MR. QUINN:  Your Honor, I represent the New York City

13   sergeants.  I have been doing that for 20 years.  I deal with

14   allegations against corrupt police officers all the time.  It

15   never gets easy.  I would never suggest that it is.  But I

16   would ask the Court to look closely at once my client was

17   arrested, he took it upon himself to do everything in his power

18   to make sure that that unit and that pistol license division

19   got cleaned up.

20           THE COURT:  I'm sorry?

21           MR. QUINN:  It got cleaned up, Judge.  The individuals

22   that were there that were corrupt, that were continuing to do

23   the things after he was arrested, he was able to assist the

24   government in making sure that doesn't happen.  So I would ask

25   the Court to give as much consideration and weight to that as

 1    the Court deems appropriate.

 2             THE COURT:  Thank you.

 3             This is not an easy decision.  Sentencings never are.

 4    It is especially true here in light of his thorough and, as the

 5    government said, exemplary cooperation.  Nonetheless, it seems

 6    to me that a policeman should be held to a higher standard than

 7    the average citizen in terms of corruption.  Given the fact

 8    that there is a multiplier effect in terms of the confidence of

 9    the people in their law enforcement officers, general

10    deterrence here is very important.

11             Nonetheless, as Mr. Monteleoni points out, there has

12    to be some proportionality in sentencing here.  I have looked

13    at all the other sentences that other judges have imposed in

14    these related cases.  I don't think a year and a day is

15    appropriate.

16             I am going to sentence this man to 4 months'

17    incarceration and the other recommendations of the probation

18    department.  I do think some time in prison is appropriate here

19    given his position as a sergeant no less, as a supervisor.  He

20    was a supervisor in this corrupt licensing division.

21             I think you're right, sir, that it has been cleaned up

22    in not insubstantial part because of his cooperation.  But the

23    word has to go out that the police of the City of New York are

24    obligated to obey the law themselves and to be an example to

25    other citizens.

 1          The NYPD web page under "Values" says, "We pledge to

 2    maintain a higher standard of integrity than is generally

 3    expected of others because so much is expected of us."  That's

 4    a nice sentiment.  But the fact is that corrupt police have a

 5    multiplier effect in the confidence of the people, and there

 6    has to be a statement that corruption among police officers

 7    will be penalized.  It's less than the others here, but I do

 8    think it is an appropriate statement.

 9          If the defendant would stand, I will impose sentence.

10          I hereby find the total offense level is 25, the

11    criminal history category is I, the guideline range is 57 to 71

12    months.  Pursuant to the Sentencing Reform Act of 1984, it is

13    the judgment of this Court that the defendant, David

14    Villanueva, is hereby committed to the custody of the Bureau of

15    Prisons to be imprisoned for a term of 4 months.  Upon release

16    from imprisonment, Mr. Villanueva shall be placed on supervised

17    release for a term of 2 years on each count, to be served

18    concurrently with each other.

19          I should say that the 4 months is on each of the six

20    counts, all to be served concurrently -- in other words, only a

21    4-month sentence -- to be followed by, quote, only 2 years of

22    supervised release.  The "only" is in quotes in both terms of

23    custody and supervised release.

24          He shall serve supervised release with the conditions

25    recommended by the probation department, namely, the following

mandatory conditions.  He shall not commit another federal, state, or local crime.  He shall not illegally possess a controlled substance.  He shall not possess a firearm or dangerous weapon or destructive device.

He shall refrain from any unlawful use of a controlled substance.  He shall submit to one drug test within 15 days of his placement on supervised release and at least two unscheduled drug tests thereafter as directed by his probation officer.  He shall cooperate in the collection of DNA as directed by his probation officer.

He shall comply with the standard conditions 1 through 12 plus the following special condition.  Actually, I'm not going to impose any special conditions and I'm going to suspend the mandatory drug testing requirement.  In other words, as a mandatory condition, he shall refrain from any unlawful use of a controlled substance, but he does not have to submit to one drug test within 15 days of placement on supervised release and two unscheduled drug tests thereafter.  He has shown no issue with drugs in the past.  I have no reason to think he will in the future.

Within 72 hours of release from the custody of the Bureau of Prisons, he shall report in person to the probation office in the district to which he has been released.  I am not imposing a fine because the defendant lacks the ability to pay a fine, after taking into account the pre-sentence report and

the forfeiture order that I have signed as well as his family

responsibilities and his current modest income.  I am not

imposing restitution because there is no victim pursuant to 18

U.S.C. 3663.

I hereby order Mr. Villanueva to pay to the United

States a special assessment of $100, which is due immediately.

And I am ordering, as I said, forfeiture of $75,000.

My deputy reminds me that I said $500.  It's $600

special assessment because there are six separate counts that

he has pled guilty to.

I sentenced this defendant with the factors of 5K1.1

in mind.  I believe the sentence is appropriate.  Given the

extreme seriousness of the offense and the need for punishment

and deterrence, I do recognize Mr. Villanueva's serious and

substantial cooperation as well as his remorse.  But for the

reasons I have said, I think it is appropriate that he serve

time incarcerated.

I see no reason to not have voluntary surrender here.

What is the position of the parties?

MR. QUINN:  Judge, I would make that request.  My

client, because of his young children who are home for the

summer, already has a paid vacation scheduled for the week of

August 10th.  Could I ask the Court for a surrender date of

August 19th?  That will allow him to take vacation with his

family.

1              THE COURT:  Government?

2              MR. MONTELEONI:   The government has no objection.

3              THE COURT:  Mr. Villanueva shall surrender for

4    sentence at the institution designated by the Bureau of Prisons

5    on or before 2:00 p.m. on August 19th.

6              Defense, are you aware of any legal reason why the

7    sentence should not be imposed as I have stated?

8              MR. QUINN:  No, your Honor.

9              THE COURT:  Government?

10             MR. MONTELEONI:  No, your Honor.

11             THE COURT:  I hereby order the sentence to be imposed

12   as I have stated it.

13             Mr. Villanueva, you have the right to appeal the

14   sentence I have imposed on you.  If you cannot pay the cost of

15   appeal, you have the right to apply for leave to apply in forma

16   pauperis.  If you make a request, the clerk of court will

17   prepare and file a notice of appeal on your behalf immediately.

18   Do you understand your appeal rights?

19             THE DEFENDANT:  Yes, I do.

20             THE COURT:  What is the position of the parties on the

21   request by a representative of the press that that letter be

22   filed publicly?

23             MR. QUINN:  Your Honor, I would obviously object, for

24   a number of reasons.  First of all, I don't know that Ms.

25   Chambers has any standing to provide this Court with any

information.  But there are factual statements contained in the

letter which I disagree with.  I don't think they are factually

accurate.  Taking where she comes from, her position, she is

the wife of someone whom my client testified against, I would

ask that it not be publicly posted.

THE COURT:  Government?

MR. MONTELEONI:  The government certainly disagrees

with some of the factual allegations in the letter, but we take

no position on its public docketing.  We don't oppose it.

THE COURT:  It is a judicial document presented to the

Court for consideration in connection with the sentencing.  I

will say that it has not materially affected my decision here.

I will have it docketed.  I will delete the identifying

information in the front as our rules provide: in other words,

the address and phone number and email address here.

I should say for the record that there are allegations

here that the parties do disagree with.  But insofar as it was

considered by the Court, I think it is appropriate that it that

it be filed, and it will be.

Anything else?

MR. MONTELEONI:  The government moves to dismiss the

underlying indictment as to the defendant.

THE COURT:  Defense?

MR. QUINN:  No objection.

THE COURT:  So granted.

1              Defense, anything else?

2              MR. QUINN:  No, your Honor.

3              THE COURT:  Mr. Villanueva, you understand fully the

4    magnitude of what you have done.  The Court understands the

5    magnitude of your assistance.  It is obviously appreciated by

6    the government, and they have stated that.  When you get out of

7    prison in 4 months, stay out of trouble.  I'm sure you will.

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Stick with your family, make amends to

10   them, and you'll be fine.

11             Thank you all.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25